1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PEDRO BARRAGAN,                              No. C 14-0475 MMC

        Plaintiff,                       **ORDER GRANTING DEFENDANTS'**
                                             **MOTIONS TO DISMISS**

  v.

PERSONNIQ, LLC; JIM PRENDERGAST;
STEVEN RIX,

        Defendants.
_____/

      Before the Court are defendant Personniq, LLC's ("Personniq") Motion to Dismiss
and defendant Jim Prendergast's ("Prendergast") "Joinder . . . and Motion to Dismiss," both
filed April 7, 2014, by which Personniq and Prendergast seek dismissal of plaintiff Pedro
Barragan's ("Barragan") Amended Complaint ("AC") pursuant to Rules 12(b)(2), 12(b)(6),
and 9(b) of the Federal Rules of Civil Procedure.  Barragan has filed a single opposition, to
which Personniq and Prendergast have jointly replied.  Having read and considered the
papers filed in support of and in opposition to the motion, the Court rules as follows.[1]

**BACKGROUND**[2]

      Barragan is a resident of Sonoma, California.  (See AC ¶ 9.)  In 2007 his son Alex

_____

    [1] By order filed May 13, 2014, the Court deemed the matter suitable for decision on
the parties' written submissions and vacated the hearing noticed for May 16, 2014.

    [2] The following facts are taken from the AC.

1   Barragan ("Alex") was in the Dominican Republic, where he met Prendergast and

2   defendant Steven Rix ("Rix") (see id. ¶ 10), president and vice president, respectively, of

3   Personniq, an Arizona corporation.  (Id. ¶¶ 4-6.)  Prendergast and Rix, both residents of

4   Arizona (see Notice of Removal ¶ 1), proceeded to tell Alex about a "great short term"

5   investment opportunity.  (See id. ¶¶ 9-11.)  Defendants explained that a developer, Ivan

6   Cofresi, needed a short term bridge loan to develop a resort called Punta Toro in Puerto

7   Rico, and that the bridge financing carried a 14% return over 360 days.  (See id. ¶¶ 12, 33.)

8   Alex informed Prendergast and Rix that his father had money to invest, and that he was

9   authorized by his father to consider investment opportunities on his father's behalf,

10  although a final decision would require his father's approval.  (See id. ¶ 11.)  Alex also told

11  Prendergast and Rix that his father did not speak, write, or read English well.  (See id.)

12          When Alex returned to the United States, he spoke to Barragan about the

13  investment.  (See id. ¶ 14.)  Thereafter, Prendergast, Rix, and "Personniq representatives"

14  called Barragan and Alex in California and had further conversations in which Prendergast,

15  Rix, and the "representatives" "reiterated" the above-described terms.  (See id. ¶ 14.)

16  Subsequently, in July and August 2007, Barragan and Alex had "several" conference calls

17  with Rix (see id. ¶¶ 14-15), in the course of which Rix told Barragan that the loan was for

18  short-term bridge financing only; that Personniq, Rix, and Prendergast had done their due

19  diligence, and knew the developer owned the land outright without any liens against it; that

20  the investment was "totally secure"; that Barragan's investment and any returns on it would

21  flow through Personniq, for added safety; that the investment was a "Personniq backed

22  asset"; that if there were any problems Personniq would take care of Barragan, as

23  Personniq would retain rights against the developer and other funding entities in the deal;

24  that if the developer defaulted on the bridge financing, Personniq could foreclose on the

25  developer's property; that Barragan's investment would be pooled with others as part of a

26  $2.5 million loan to the developer, secured by the land on which the development was to be

27  built; and that the current appraisal for the land being developed was approximately $23

28  million.  (See id. ¶ 16.)

When Barragan raised concerns about investing abroad, Rix stated that Personniq "backed" the deal, that the land was owned 100% outright by the developer, and that Personniq would retain legal rights against the developer and Bulls Point Investments, the lending vehicle.  (See id. ¶ 17.)

Thereafter, "defendants" asked Barragan to make a $100,000 investment.  (See id. ¶ 18.)  "Defendants explained that they received a cut of any investment they successfully procured for the developer," after which Barragan received a document titled "Revenue Participation Agreement," sent to his home in Sonoma "by defendants." (Id. ¶ 19.)  The agreement provided that "Personniq 'would receive certain sums and other valuable considerations as commission for its services in obtaining' the loan," that "a 'portion of said commission shall be paid [to Personniq] simultaneously with the execution of the agreement for the loan disbursement'" (id.) (alteration in original), and that "Personniq further received 5% of the shares of the borrower as partial security for the loan."  (Id.)

"[B]ased on the representations made to him by Personniq's officers and directors, including defendants Prendergast and Rix," Barragan agreed to invest $100,000.  (Id. ¶ 20.) "Personniq advised [Barragan] that they wanted him to wire the $100,000 he had in California to them in Arizona," and "Personniq, through defendant Prendergast," sent a package to Barragan's residence in California that included instructions for wiring the money.  (See id. ¶¶ 21-22.)  The package included a document titled "Wire Instructions," on the letterhead of Title Services of the Valley, an entity owned by Prendergast, which "defendants" told Barragan was the escrow entity selected by defendants to handle the transaction.  (See id. ¶¶ 23-25, 31.)  "Defendants told" Barragan to execute several of the documents in the package and return them, which he did.  (See id. ¶ 27.)  In addition to the written wire instructions, "Defendants then told" Barragan to wire $100,000 from his bank account in California to a bank account maintained in Mesa, Arizona by Title Services of the Valley.  (See id. ¶ 28.)  "After the wire was sent, defendant Prendergast sent [Barragan] in California a letter on defendant Personniq's letterhead," congratulating "[Barragan] on participating 'in another Personniq asset backed investment'"; the same packet contained,

3

1   <u>inter alia</u>, documents "set[ting] forth the terms of the deal" and Barragan's first interest

2   check.  (<u>See id.</u> ¶ 32-33.)  "Per the memorialized written contractual terms, [Barragan] was

3   to be paid 14% interest over eighteen months, with an option to extend the note to

4   September 1, 2009."  (<u>Id.</u> ¶ 33.)

5       "For a period of time," Barragan received interest payments at his home in Sonoma,

6   in the form of both checks and wire transactions.  (<u>See id.</u> ¶ 34.)  "[A]fter a period of time,

7   the interest payments ceased."  (<u>See id.</u>)  Barragan and his son communicated with

8   "Personniq and Personniq members, officers and employees," who "maintained that all

9   would be fine and that there was a temporary financing issue, but that once it was

10  inevitably resolved, that [Barragan] would be paid in full."  (<u>Id.</u>)  Subsequently, "[f]or a

11  period of time, defendants sent newsletters and progress reports on the Punta Toro resort

12  development project via mail to [Barragan's] address in Sonoma." (Id. ¶ 35.)

13      "By the fall of 2010," Barragan had not received any additional payments, and

14  retained an attorney "to get answers as to the status of the project."  The attorney sent

15  Prendergast and Rix a letter requesting that the terms of the investment be honored, but

16  never received a response.  (<u>Id.</u> ¶¶ 36-37.)

17      On July 30, 2013, Barragan filed the instant action in Sonoma County Superior

18  Court.  On January 31, 2014, defendants Personniq and Prendergast removed the action

19  to federal court on the basis of diversity jurisdiction.[3]  By the AC, Barragan brings the

20  following state law causes of action: "Fraud" (First Cause of Action), "Fraud Deceit"

21  (Second Cause of Action), "Business and Professions Code Section 17200" (Third Cause

22  of Action), "Conversion" (Fourth Cause of Action), and "Unjust Enrichment" (Fifth Cause of

23  Action).

**LEGAL STANDARD**

24

25      Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be based

26

27  _____

28      [3] Defendant Rix did not join in the removal because he had not, and to date has not,
    been served.  (<u>See</u> Notice of Removal ¶ 1.)

4

1    on the lack of a

2    cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal

3    theory.  See Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  Rule

4    8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the

5    pleader is entitled to relief.'"  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)

6    (quoting Fed. R. Civ. P. 8(a)(2)).  Consequently, "a complaint attacked by a Rule 12(b)(6)

7    motion to dismiss does not need detailed factual allegations."  See id.  Nonetheless, "a

8    plaintiff's obligation to provide the grounds of his entitlement to relief requires more than

9    labels and conclusions, and a formulaic recitation of the elements of a cause of action will

10   not do."  See id. (internal quotation, citation, and alteration omitted).

11      In analyzing a motion to dismiss, a district court must accept as true all material

12   allegations in the complaint, and construe them in the light most favorable to the

13   nonmoving party.  See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

14   "To survive a motion to dismiss, a complaint must contain sufficient factual material,

15   accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal,

16   556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "Factual allegations must

17   be enough to raise a right to relief above the speculative level[.]"  Twombly, 550 U.S. at

18   555.  Courts "are not bound to accept as true a legal conclusion couched as a factual

19   allegation."  See Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

20                                    **DISCUSSION**

21      By the instant motion, Personniq and Prendergast seek dismissal of the AC, arguing

22   (1) that the Court lacks personal jurisdiction over them, (2) that Barragan has failed to state

23   a claim upon which relief can be granted, and (3) that the fraud claims are not pleaded with

24   the requisite specificity.  Prendergast, in his joinder, additionally argues that Barragan has

25   failed to plead sufficient facts to support a claim against him in his individual capacity.

26   Because the jurisdictional issue raised by defendants is intertwined with the allegations of

27   fraud and conversion, the Court first addresses the sufficiency of Barragan's claims as

28   pleaded.

1  **A.      First and Second Causes of Action**

2          Barragan's First and Second Causes of Action assert, respectively, claims of "Fraud"

3  and "Fraud Deceit."

4          Under California law, "[t]he necessary elements of fraud are: (1) misrepresentation

5  (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter);

6  (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting

7  damage." Alliance Mortgage Co. v. Rothwell, 10 Cal. 4th 1226, 1239 (1995) (internal

8  quotation and citation omitted); see also Lazar v. Superior Court, 12 Cal. 4th 631, 638

9  (1996) (characterizing "promissory fraud" as "subspecies of the action for fraud and deceit";

10  holding "where a promise is made without [the intention to perform] there is an implied

11  misrepresentation of fact").

12          In federal court, under Rule 9(b), fraud claims must be pleaded "with particularity."

13  See Fed. R. Civ. P. 9(b); Kearns v. Ford Motor Co., 567 F. 3d 1120, 1125 (9th Cir. 2009.)

14  "In order to plead fraud with particularity, the complaint must allege the time, place, and

15  content of the fraudulent representation; conclusory allegations do not suffice."  Shroyer v.

16  New Cingular Wireless Services, Inc., 622 F.3d 1035, 1042 (9th Cir. 2010); see Vess v.

17  Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (noting that "averments of

18  fraud must be accompanied by the who what when were and how of the misconduct

19  charged") (internal quotation and citation omitted).  The allegations "must be specific

20  enough to give defendants notice of the particular misconduct which is alleged to constitute

21  the fraud so they can defend against the charge[.]"  See Bly-Magee v. California, 236 F.3d

22  1014 (9th Cir. 2001) (internal quotation and citation omitted).

23          Here, although Barragan alleges a number of factual representations were made to

24  him (see, e.g. AC ¶¶ 16, 17 (alleging representations that the property had been appraised

25  at $23 million, that it was wholly owned by the developer, that there were no liens)), and

26  that a number of promises were made to him (see, e.g., id. ¶¶ 12, 33 (alleging promises

27  that subject property would be developed as resort and Barragan was to be paid 14%

28  interest over 18 months)), he has not identified the particular representation(s) and/or

1   promise(s) he asserts were false when made or how any defendant knew any such

2   statement was false at the time it was made.  (See, e.g., id. ¶¶ 41, 50 (alleging "all of the

3   promises and representations" made to him "have proven false and untrue")); see Tenzer

4   v. Superscope, Inc., 39 Cal.3d 18, 30, 216 Cal. Rptr. 130, 702 P.2d 212 (1985) (rejecting

5   argument that "subsequent failure to perform as promised [under contract] warrants the

6   inference that defendant did not intend to perform when [defendant] made the promise";

7   finding California law requires "something more than nonperformance" to establish fraud

8   claim based on failure to perform contractual promise); see also Fecht v. Price Co., 70 F.3d

9   1078, 1083 (9th Cir.1995) (holding Rule 9(b) requires plaintiff to allege "sufficient

10  evidentiary facts" to support finding that challenged statements were false when made),

11  cert. denied, 517 U.S. 1136 (1996).

12        Moreover, in most instances, Barragan fails to allege clearly who made the various

13  statements and when, specifically, they were made.  (See, e.g. AC ¶¶ 11-13 (alleging

14  "defendants" while in the Dominican Republic, made various representations to Alex); ¶ 14

15  (alleging "further discussions" in which "defendants . . . reiterated and re-confirmed" the

16  representations made in the Dominican Republic); ¶ 18 (stating "defendants asked"

17  Barragan to make $100,000 investment); ¶ 33-35 (alleging various mailings sent by

18  "defendants").)[4]

19        Accordingly, the First and Second Causes of Action will be dismissed with leave to

20  amend to cure the deficiencies noted above.

21        **B.    Fourth Cause of Action**

22        Barragan's Fourth Cause of Action asserts a claim of "Conversion."  Under

23  California law, "[t]he elements of a conversion are the plaintiff's ownership or right to

24  _____

25        [4]In light of the above, the Court does not address at this time Prendergast's
26  argument that he cannot be held liable in his individual capacity.  United States Liab. Ins.
    Co. v. Haidinger-Hayes, Inc., 1 Cal. 3d 586, 595 (1970) (holding "[d]irectors or officers of a
27  corporation do not incur personal liability for torts of the corporation merely by reason of
    their official position, unless they participate in the wrong or authorize or direct that it be
28  done.").

1    possession of the property at the time of the conversion; the defendant's conversion by a

2    wrongful act or disposition of property rights; and damages."  Plummer v. Day/Eisenberg,

3    LLP, 184 Cal. App. 4th 38, 45 (2010).

4           Personniq and Prendergast first argue that they are not proper defendants to either

5    claim because Barragan's "investment was made in an entity named Bulls Point

6    Investments" and Personniq acted only "as the servicing agent for the transaction."  (See

7    Mot. at 19-20.)  The Court disagrees.  Although the AC does allege Barragan was told that

8    "Bulls Point Investments, Inc." was "the lending vehicle" (see AC ¶ 17), it also alleges the

9    written agreement provided that Personniq was to receive a portion of Barragan's

10   investment.  (See id. ¶ 19.)  Whether or not Personniq received such funds directly from

11   Barragan or later through a separate "lending vehicle," is not dispositive, as liability for

12   conversion can attach to successive owners of the wrongfully converted property.  See

13   Oakdale Vill. Grp. v. Fong, 43 Cal. App. 4th 539, 546 (1996).[5]

14          Personniq and Prendergast next argue that the Fourth Cause of Action is barred by

15   California's three-year statute of limitations for conversion. See Cal. Code Civ. Proc.

16   § 338(c).  In particular, as Personniq and Prendergast point out, the AC alleges Barragan

17   made his investment in "July or August of 2007" (see AC ¶ 15), and his initial complaint

18   was not filed until July 30, 2013.  Under California law, a cause of action ordinarily accrues

19   when "the wrongful act is done, or the wrongful result occurs, and the consequent liability

20   arises."  Norgart v. Upjohn Co., 21 Cal. 4th 383, 397 (1999) (internal quotations and citation

21   omitted).  In other words, the statute begins to run "when the cause of action is complete

22   with all of its elements."  Id.  Pursuant to one of the exceptions thereto, the "discovery rule,"

23   accrual of a cause of action is postponed "until the plaintiff discovers, or has reason to

24   discover, the cause of action."  Id.  In order to invoke such delayed discovery exception, a

25   plaintiff "must specifically plead facts which show (1) the time and manner of discovery and

26

27          [5] The Court notes, however, that a claim of conversion requires a "wrongful act," see
     Plummer, 184 Cal. App. 4th at 45, and to the extent Barragan relies on fraud as such
28   "wrongful act," that element, as discussed above, has not been adequately pleaded.

1  (2) the inability to have made earlier discovery despite reasonable diligence." Yumul v.

2  Smart Balance, Inc., 733 F.Supp.2d 1117, 1130 (C.D. Cal. 2010) (internal quotation and

3  citation omitted).  Additionally, when a plaintiff seeks to toll the statute of limitations based

4  on the defendant's fraudulent concealment of the cause of action, the allegations in support

5  thereof must comply with the particularity requirements of Rule 9(b).  Wasco Products v.

6  Southwall Technologies, 435 F.3d 989 (9th Cir. 2006)

7         In reliance on the discovery rule, Barragan contends accrual of his conversion claim

8  should be delayed until the fall of 2010, because, until that point, defendants had

9  fraudulently concealed the relevant facts necessary for him to recognize he could make

10  such claim.  (See Opp. at 17:1-15.)  As with his fraud causes of action, however, Barragan

11  fails to allege the requisite "who, what, when, where, and how."  See Vess, 317 F.3d at

12  1106 (internal quotation and citation omitted); see, e.g. AC ¶ 34 (alleging Barragan stopped

13  receiving interest payments from his investment after "a period of time"); id. (alleging

14  "Personniq and Personniq members, officers and employees" had "several conversations"

15  in which "defendants" stated there was a temporary financing issue and that he would be

16  paid in full.)

17         Accordingly, the Fourth Cause of Action will be dismissed with leave to amend to

18  cure the deficiencies noted above.

19  **C.     Third and Fifth Causes of Action**

20         Barragan's Third and Fifth Causes of Action assert, respectively, a claim under

21  California Business and Professions Code section 17200 and a claim of unjust enrichment.

22  Such claims, as pleaded, are wholly derivative of Barragan's other causes of action.  (See

23  AC ¶¶ 63 (alleging "[e]ach defendant's conduct herein alleged constitutes unlawful, unfair

24  and/or fraudulent business practices in violation of § 17200 et seq.); id. ¶ 85 (alleging

25  defendants have been unjustly enriched "[b]y negligently, recklessly or

26  intentionally/deliberately perpetrating the wrongful acts detailed [earlier] in this complaint").)

27         As discussed above, Barragan's fraud causes of action are subject to dismissal and,

28  consequently, Barragan's Third and Fifth Causes of Action, to the extent based thereon,

1  likewise fail.  See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th

2  163, 180 (1999) (noting § 17200 "borrows violations of other laws and treats them as

3  unlawful practices that the unfair competition law makes independently actionable"); Marina

4  Tenants Ass'n. v. Deauville Marina Dev. Co., 181 Cal. App. 3d 122, 134 (1986) (affirming

5  dismissal of unjust enrichment claim where claim was "wholly derivative of" previously-

6  dismissed claim).

7         To the extent the Third and Fifth Causes of Action are predicated on Barragan's

8  conversion claim, such claims also fail.  The statute of limitations for unjust enrichment is

9  based on the underlying wrong, see FDIC v. Dintino, 167 Cal. App. 4th 333, 348 (2008),

10  and, as discussed above, Barragan's conversion claim is subject to dismissal on limitations

11  grounds.  Although section 17200 has its own statute of limitations, four years, see Cal.

12  Bus. & Prof.Code § 17208 (2002), which applies even where the limitations period for the

13  borrowed claim is shorter, see RA Medical Sys., Inc. v. PhotoMedex, Inc., 373 Fed. Appx.

14  784, 786 (9th Cir.2010), here, as discussed above, Barragan filed his complaint

15  approximately six years after he alleges the conversion occurred and he has failed to plead

16  delayed accrual with sufficient particularity.

17         Accordingly, Barragan's Third and Fifth Causes of Action will be dismissed with

18  leave to amend to cure the deficiencies noted above.[6]

19  //

20  //

21  //

22  //

23  //

24  //

25  //

---

[6] In light of the above, the Court does not address at this time Personniq and
Prendergast's arguments as to personal jurisdiction.

10

**CONCLUSION**

For the reasons stated:

1.  Defendants' motion to dismiss the AC is hereby GRANTED, with leave to amend as set forth above.

2.  Any Second Amended Complaint shall be filed no later than October 10, 2014, and, except as set forth above, plaintiff may not add any new federal or state law claims, nor may he add any new defendant, without first obtaining leave of court.  See Fed. R. Civ. P. 15(a)(2).

**IT IS SO ORDERED.**

Dated: September 17, 2014

_____
MAXINE M. CHESNEY
United States District Judge